IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SELECTIVE INSURANCE COMPANY OF SOUTH )
CAROLINA, )
 )
      Plaintiff, )
 )
  v. ) Case 13 CV 5910
 )
 )
TARGET CORPORATION and ANGELA BROWN, )
 )
      Defendants. )
 )

## MEMORANDUM OPINION AND ORDER

This declaratory action arises out of a lawsuit by defendant Angela Brown,[1] who claims she was injured when the door to a fitting room at a Target retail store came unhinged and fell on her head and shoulder. Target tendered defense of the action to Selective Insurance Company, claiming to be an additional insured under a policy Selective had issued to Harbor Industries, Inc., the company that supplied Target with its fitting rooms. Selective's complaint seeks a judgment that it has no duty to defend or indemnify Target in the underlying action (which has since settled) because Target does not qualify as an additional insured under the terms of Harbor's policy (Count I).

---

[1] Brown "is named as a defendant herein because of her status as a necessary party by virtue of her status as the plaintiff in the underlying case." She has not been served in this action, and the complaint does not seek any relief as to her.

Alternatively, Selective seeks a judgment that even if Target qualifies as an additional insured, Selective has no duty to defend or indemnify Target because the underlying lawsuit is outside the scope of the policy's coverage (Count II), or because the underlying action constitutes an "uninsurable known risk" under the policy (Count III).

Before me Target's is motion for summary judgment, which seeks a ruling that Selective was required to defend and indemnify it for the underlying action, and Selective's motion for partial summary judgment, which seeks a ruling that it had no duty to defend Target.[2] For the reasons that follow, I deny Selective's motion and grant Target's motion.

I.

The parties' dispute boils down to two issues: first, whether three documents--the insurance policy Selective issued to Harbor (the "Policy"); the "Supplier Qualification Agreement" between Harbor and Target (the "SQA"); and the "Program Agreement for Fitting Rooms (2010)" (the "Program Agreement") under which Harbor sold fitting rooms to Target--establish that Target is an additional insured under the Policy; and second, assuming that

---

[2] At the time Selective filed its motion, the underlying case was in the process of settling. Selective appropriately reserved argument on whether it owed Target any duty to indemnify until settlement was complete. *See Travelers Inc. Cos. v. Penda Corp.*, 974 F.2d 823, 833 (7th Cir. 1992) (duty to indemnify arises only after insured becomes legally obligated to pay damages in underlying action).

Target is insured by the Policy, whether the underlying lawsuit is a covered claim.

On the first issue, the effective dates of the agreements and the timing of Brown's injury are significant. The SQA became effective on April 16, 2007, and it remains in effect by its terms until terminated by the parties pursuant to its termination provisions. Pl.'s L.R. 56.1 Stmt., Exh. M. Selective does not suggest that either Harbor or Target terminated the SQA pursuant to those provisions, and as far as the record reveals, it remains in effect to this day. The Program Agreement went into effect on April 23, 2009, and it expired on July 1, 2010. *Id.*, Exh. L. The Policy's inception date was January 1, 2011, and it expired on January 1, 2012. *Id.*, Exh. N at p. 2. Brown's injury occurred on December 17, 2011, Pl.'s L.R. 56.1 Stmt., Exh. D., which is to say, while the SQA and the Policy were in effect, but after the Program Agreement had expired.

The Policy provides Commercial General Liability ("CGL") Coverage pursuant to terms that include amendments contained in the "ELITEPAC General Liability Extension" endorsement ("the ELITEPAC"). Pl.'s L.R. 56.1 Stmt., Exhs. N-3, at 145-60 and N-4, at 166-72. There is no dispute that Target's entitlement to coverage for the Brown action, if any, arises from its putative status as an "additional insured" under the ELITEPAC, which states:

3

> WHO IS AN INSURED - Amendments
> ***
> Blanket Additional Insureds Including Broad Form Vendors
> – As Required by Contract
>
> WHO IS AN INSURED is amended to include as an additional insured any person or organization whom you [Harbor] have agreed in a written contract, written agreement or written permit to add as an additional insured on your policy. ***
>
> ***
>
> The provisions of this coverage extension do not apply unless the written contract or written agreement has been executed (executed means signed by the named insured) or written permit issued prior to the "bodily injury" or "property damage".

*Id.*, at 169-70.

The SQA provides that it "shall apply to and control and shall be deemed incorporated into all agreements relating to the purchase of non-retail (not for resale) goods and/or services from [Harbor] by Target." Pl.'s L.R. 56.1 Stmt., Exh. M at 1. In a section captioned "Insurance Requirements," the SQA states:

> [Harbor]'s Commercial General Liability Insurance shall designate Target as an additional insured by endorsement acceptable to Target. Designation of Target as an additional insured shall include as an insured with respect to third party claims or actions brought directly against Target or against Target and [Harbor] as co-defendants and arising out of this Agreement. [Harbor]'s insurance shall include products and completed operations liability coverage….

Pl.'s L.R. 56.1 Stmt., Exh. M at 4.

The Program Agreement is a requirements contract between Target and Harbor, which provides that as long as Harbor and its

product comply with certain criteria, "Target agrees to purchase from [Harbor] all of Target's needed supply of the Goods during the Term of this Program Agreement." *Id*. at 3. The "Goods" are defined as the "product or item which is a product that meets Target's specifications for Target's prototype," and are identified as "Fitting Rooms." Pl.'s L.R. 56.1 Stmt., Exh. L at 1.

II.

In support of its claim that it owes no duty to Target, Selective homes in on the Policy's requirement that to qualify as an additional insured, Target must have with its insured "a written contract, written agreement or written permit to add as an additional insured." Selective insists that Target does not meet this requirement because the Program Agreement between Harbor and Target had expired before the Policy's inception and before Brown was injured. This argument has no merit. The "written agreement" that binds Harbor to add Target as an additional insured is found in the SQA, not in the Program Agreement. Moreover, the SQA states on its face that Harbor must "maintain [CGL and other insurance] in full force and effect *during the term of this Agreement*" (emphasis added). And there is no dispute that the SQA was in effect at the time of Brown's accident and throughout the term of the Policy.

5

Selective points to language in the SQA stating that "[i]n the event of any conflict between this Agreement and the specific Order or Program Agreement, the terms of the Order or Program Agreement shall govern." *Id*. at 1. According to Selective, this means that the Program Agreement "controls the issue of the effective dates of the contract," which I take to mean that in Selective's view, the SQA terminated at the term of the Program Agreement, regardless of whether the parties invoked the termination provisions contained in the SQA itself. That argument is meritless.

The SQA is a broad agreement "to establish the terms and conditions of being qualified to do business with Target." Pl.'s L.R. 56.1 Stmt., Exh. M at 1. It applies, on its face, to "all agreements" for Target's purchase on non-retail goods and services from Harbor, and it contemplates that discrete purchases by Target, if any, would be governed by specific Orders or Program Agreements. The Program Agreement at issue here was one such specific agreement. Understood in this way, there is no conflict at all between the termination provisions of the two agreements. At the term of the Program Agreement, Target was no longer obligated to purchase its fitting room requirements from Harbor, and Harbor was no longer obligated to provide them. The SQA remained in effect, however, and would be incorporated into future program agreements, if any, between the parties. It continued to

6

require that Harbor's CGL insurance name Target as an additional insured, and that such insurance include "products and completed operations liability coverage." Accordingly, Selective's argument that "the requirement that Harbor name Target as an additional insured on its policy expired when the Program Agreement expired" is unpersuasive. Pl.'s Reply, at 3. I conclude that the SQA satisfies the Policy's requirement of a "written contract" necessary for Target to qualify as an additional insured under the Policy.

Selective's next argument is that even if Target qualifies as an additional insured under the Policy, the underlying action is outside the scope of the Policy's coverage. This argument is also unavailing. The ELITEPAC covers "liability for 'bodily injury'...caused in whole or in part, by...'your product'...." Pl.'s L.R. 56.1 Stmt., Exh. N-4 at 169. Selective argues that because Brown claimed that Target's own negligence caused her injury, her lawsuit does not assert liability "caused by" Harbor's "product."[3]

Insurance policies must be liberally construed in favor of coverage, and because "the threshold for pleading a duty to defend

---

[3] Selective appears to have abandoned Count III of its complaint, as its response to Target's motion argues that Target's claim falls outside the Policy's coverage of liability for "bodily injury...caused, in whole or in part, by...your product," but it does not respond to Target's argument that the "known loss" doctrine does not preclude Target's claim.

7

is low, any doubt with regard to such duty is to be resolved in favor of the insured." *Am. Econ. Ins. Co. v. Holabird and Root*, 886 N.E. 2d 1166, 1171 (Ill. App. Ct. 2008). "Whether an insurer has a duty to defend depends on a comparison of the allegations of the underlying complaint to the relevant policy provisions." *Nat'l Union Fire Ins. Co. v. R. Olson Construction Contractors, Inc.*, 769 N.E. 977, 981 (Ill. App. Ct. 2002). Here, defendant Brown alleged that Target: a) allowed the door to its fitting room fall into disrepair; b) failed to maintain the door in a reasonably safe condition; c) allowed the door to become loose; d) failed to repair the door after having notice that it had fallen into disrepair; and e) failed to warn its customers that its fitting room door was in an unreasonably dangerous and hazardous condition. Pl.'s L.R. 56.1 Stmt., Exh. D at 2.

Bearing in mind that I must construe the Policy liberally in favor of coverage, I conclude that Brown's allegations fall within the scope of the Policy, as they can reasonably be read to assert a "bodily injury" that was "caused, in whole or in part," by Harbor's "product." Selective raises two arguments to the contrary: first, that Harbor's fitting rooms are not "products," and second, that because Brown sued only Target, and alleged only Target's negligence, her injury was not caused by Harbor's product. The first argument borders on frivolous. Setting aside that the Program Agreement explicitly identifies "Fitting Rooms"

8

as the "product" to which it relates, Selective points to nothing in the Policy to indicate that the term "product" as used therein should be given any other construction than its ordinary one, and the first entry in the Merriam-Webster dictionary for "product" is "something that is made or grown to be sold or used."[4] Plainly the fitting rooms *made* by Harbor, *sold* to Target, and *used* by Brown fall well within that definition.

Selective's next argument is that the Policy's coverage of claims for bodily injury "caused...by" Harbor's products should be limited to claims in which Target's alleged liability is vicarious, arising out of Harbor's own acts. Selective relies for this argument on *Lincoln General Ins. Co. v. Federal Constr., Inc.,* No. 09 C 6087, 2010 WL 4978852 (N.D. Ill. Dec. 2, 2010) (Hart, J.), in which the court held that an insurer had no duty to defend or indemnify Federal Construction, which sought coverage as an additional insured on a policy issued to Federal's subcontractor, Friedler Construction, for an underlying action that asserted willful and wanton conduct by Federal. The additional insured endorsement in the policy at issue covered liability for injuries "caused, in whole or in part, by: 1. Your [i.e., Friedler's] acts or omissions; or 2. The acts or omissions of those acting on your behalf." *Id*. at *2. The court construed

---

[4] See http://www.merriam-webster.com/dictionary/product, accessed 9/11/2015.

those provisions as limited to claims in which the additional insured's liability was based on Friedler's own conduct, or conduct that could be imputed to Friedler and reasonably concluded that the underlying allegations of intentional wrongdoing by Federal fell outside that scope.

Here, by contrast, the Policy covers "bodily injury" caused in whole or in part by Harbor's "product," and Brown's allegations can reasonably be read to fall potentially within this scope. True, she sued only Target. But as a practical matter, she may have had no way of knowing who else might have been responsible for the allegedly unsafe condition of the door. Moreover, if the fitting room door were defectively designed or manufactured by Harbor, Target may still be held liable for contributing to Brown's injury, based on her allegation that it failed to "maintain" the door in a reasonably safe condition, or to warn customers that it was unsafe. "The duty to defend does not require that the complaint allege or use language affirmatively bringing the claims within the scope of the policy. The question of coverage should not hinge on the draftsmanship skills or whims of the plaintiff in the underlying action." *Holabird & Root*, 886 N.E. 2d. at 1171 (alterations, internal quotation marks, and citation omitted). I am satisfied that Brown's complaint alleges, on its face, facts "within or potentially within policy coverage," sufficient to trigger Selective's duty to defend. *Id.*

Accordingly, I need not reach the parties' additional arguments relating to whether it is appropriate to consider Target's third-party complaint against Harbor, or true but unpled facts outside Brown's complaint, in determining whether Target's insurance claim falls within the scope of coverage.

This brings me to the final issue, which is whether Selective has a duty to indemnify Target for its costs in settling the underlying action. The duty to indemnify is narrower than the duty to defend, arising only when the facts alleged in the underlying complaint *actually* (not just *potentially*) fall within the scope of coverage. *Crum and Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E. 2d 1073, 1081 (Ill. 1993). In cases such as this, where the underlying action settles prior to verdict, the insured must demonstrate "that it settled an otherwise covered loss in reasonable anticipation of personal liability." *United States Gypsum Co. v. Admiral Insurance Co.*, 643 N.E. 2d 1226, 1240 (1994).

To establish that Target settled the underlying action in reasonable anticipation of liability, Target offers the affidavit of its outside counsel, Robert Burke, who represented Target both in the underlying action and in this coverage dispute. Selective has moved to strike the Burke affidavit on various grounds, including that Mr. Burke was not disclosed as a witness, is not a corporate representative of Target, and offers evidence only of

his opinions and legal conclusions, not of facts. Target responds that any failure to disclose Mr. Burke was harmless, that he is competent to testify as to Target's reasons for settling the underlying lawsuit based on his personal knowledge, and that Target need not offer "de novo proof" of facts establishing its potential liability to show that it settled in reasonable anticipation of liability.

Target is correct that it need not offer "de novo proof" of its potential liability. Still, *U.S. Gypsum*--the leading Illinois case on this issue, and the authority on which Target primarily relies--plainly contemplated that *some* evidence from the underlying case (as opposed to ex post statements by counsel) would be offered to support the insured's argument that it settled in reasonable anticipation of liability. *See id*. at 1245 (holding that the insured may offer "testimony, evidence or depositions obtained or adduced *in the underlying cases*" because "whether Gypsum's anticipation of liability was reasonable would naturally turn on the quality and quantity of proof *which Gypsum would expect to be offered against it in the underlying action*.") (Emphasis added). Indeed, neither *Gypsum* nor any other case Target cites concluded that the insured carried its burden based solely on an affidavit of outside counsel. *Cf. Federal Ins. Co. v. Binney & Smith, Inc.*, 913 N.E. 2d 43 (Ill. App. Ct. 2009) (relying on affidavits of in-house and outside counsel).

12

Ultimately, however, I need not decide whether to consider the Burke affidavit, or whether, if considered, it is sufficient to establish that Target settled the underlying case in reasonable anticipation of liability. I am satisfied, based on my own review of the record, which includes Brown's deposition testimony describing how her injury occurred, Pl.'s L.R. 56.1 Stmt., Exh. F at 29 (DN 72-6), and evidence that Target was aware of similar incidents that occurred shortly before Brown's, *id.*, Exh. I, that it contains sufficient evidence to support a reasonable anticipation of liability. And because Selective's substantive arguments on this issue essentially just reiterate its coverage position, it fails to rebut the inference raised by the factual record.

III.

For the foregoing reasons, I grant Target's motion for summary judgment and deny Selective's motion for partial summary judgment.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: September 15, 2015